UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

ARMOR HOLDINGS, INC., d/b/a
SECOND CHANCE ARMOR, INC.,

    Plaintiff,

v.                                                                                  Case No.  5:05-CV-180

JIM LAYMAN & ASSOCIATES, LLC.,                      HON. GORDON J. QUIST
et al.,

    Defendants.
_____/

## OPINION

Plaintiff, Armor Holdings, Inc. ("AHI"), d/b/a Second Chance Armor, Inc. ("SCAI"), filed its complaint in this case against Defendants, Jim Layman & Associates, LLC ("Jim Layman"), Ron Macy Associates ("Ron Macy"), Tayler Jordan & Associates, LLC ("Tayler Jordan"), and Thoroughbred Associates, Inc. ("Thoroughbred"), in the Antrim County Circuit Court on or about November 18, 2005, alleging claims of breach of contract based upon Defendants' alleged violation of non-competition provisions in their respective sales representative agreements with AHI/SCAI's alleged predecessor. On December 5, 2005, Tayler Jordan filed a notice of removal to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.[1]  Presently before the Court is AHI/SCAI's motion for preliminary injunction. The Court heard oral argument on the motion on March 31, 2006. For the reasons stated below, as well as the reasons the Court gave from the bench at the conclusion of the March 31, 2006, hearing, the Court will deny the motion.

---

[1]Pursuant to the Court's December 27, 2005, Order, Tayler Jordan filed an amended notice of removal on January 13, 2006, and a second amended notice of removal on January 19, 2006, in order to clarify the citizenship and form of business entity of AHI/SCAI and Defendants. Among other things, Tayler Jordan's amended notices established that Ron Macy is a sole proprietorship, that AHI is a Delaware corporation with its principal place of business in Florida, and that SCAI is not a d/b/a of AHI, but instead is a Delaware corporation with its principal place of business in Michigan.

## I. Facts

On July 27, 2005, AHI, through SCAI, its subsidiary, purchased substantially all of the assets of Second Chance Body Armor, Inc. ("SCBA"), a Michigan corporation, pursuant to a bankruptcy sale. Prior to the sale, SCBA was in the business of manufacturing body armor for law enforcement and military markets in the United States and abroad. SCBA distributed its products through dealers and distributors and used a direct-bid process for larger law enforcement agencies. SCBA used independent sales representatives to supervise and manage the dealers and distributors within the various sales territories. SCBA's bankruptcy stemmed from problems that it experienced with its soft bullet-proof vests. Specifically, the company and consumers learned that the lightweight material inside the vests, called Zylon, deteriorated when exposed to certain conditions. As a result, SCBA was sued in a number of lawsuits over the defective vests, eventually causing SCBA to file bankruptcy.

Pursuant to the Asset Purchase Agreement ("Purchase Agreement") between SCBA and AHI/SCAI, AHI/SCAI purchased the "Purchased Assets," which included, among other things: (1) "all Purchased Contracts"; (2) "all rights of [SCBA] under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of [SCBA] or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof)"; and (3) "all goodwill and other intangible assets associated with the Business, including customer, distributor, dealer, representative, and supplier lists, and the goodwill associated with the Purchased Assets and Purchased Intellectual Property owned by [SCBA]." (Purchase Agreement Art. II, § 2.1(h), (l), and (n).) Certain assets, referred to as the "Excluded Assets," were not sold as part of the transaction. With regard to those assets, the Purchase Agreement provided: "Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to [AHI/SCAI], and [SCBA] shall

retain *all right, title, and interest to, in, and under* the Excluded Assets." (Id. Art. II, § 2.2 (italics added).) "Excluded Contracts" were included among Excluded Assets. (Id. Art. II, § 2.2(c).) Schedule 1.1(a) to the Purchase Agreement sets forth the Excluded Contracts, while Schedule 1.1(b) sets forth the Purchased Contracts. Since the sale, AHI/SCAI has operated a body armor business from the same headquarters in Central Lake, Michigan, that SCBA had used.

Prior to the asset sale, each Defendant served as an independent sales representative for SCBA. On June 1, 1991, Thoroughbred and SCBA entered into a Sales Representative Agreement ("SRA"), pursuant to which Thoroughbred agreed to act as SCBA's exclusive sales representative for the states of Arkansas, Louisiana, Oklahoma, and Texas. Thoroughbred's SRA contained the following language:

> In consideration of [SCBA] providing [Thoroughbred] with exclusive territory, [Thoroughbred] agrees not to represent any competitive brand of body armor during the term of this Agreement or any extension or renewal thereof. All trade secrets, cost information, and marketing data acquired by the representative remains the property of [SCBA], and may not be disclosed to a competitor, his agent, or representative thereof, for a period of one year after the termination of all or part of this contract.
>
> [Thoroughbred] also agrees not to represent any other body armor company for a period of one year after termination of this contract.

(Thoroughbred Sales Representative Agreement at 2.) On July 12, 2005, prior to the date of the asset sale, SCBA and Thoroughbred entered into an agreement regarding the termination of Thoroughbred's relationship with SCBA. (Thoroughbred Termination Agreement, Thoroughbred's Br. Opp'n Ex. B.) The termination agreement, signed by Matt Davis on behalf of SCBA, provided: "This Agreement supersedes all other written or verbal agreements between the parties." (Id.) Thoroughbred's June 1, 1991, SRA was listed as an Excluded Contract on Schedule 1.1(a).

On January 1, 1994, Jim Layman (which, for purposes of this Opinion only, the Court will assume is a successor to J.R.L. Enterprises) and SCBA entered into a Regional Sales Manager

Agreement ("RSMA"), pursuant to which Jim Layman agreed to serve as SCBA's exclusive sales representative in the states of Montana, Wyoming, Colorado, Utah, New Mexico, Kansas, and Nebraska. Jim Layman's RSMA contained substantially the same non-disclosure and non-compete provisions as Thoroughbred's SRA, except that Jim Layman's agreement stated that the post-termination non-compete provision would "be null and void if termination is initiated by [SCBA]." On July 11, 2005, prior to the date of the asset sale, SCBA and Jim Layman entered into an agreement regarding the termination of Jim Layman's relationship with SCBA. (Jim Layman Termination Agreement, Jim Layman's Br. Opp'n Ex. B.) The termination agreement, signed by Matt Davis on behalf of SCBA, provided: "This Agreement supersedes all other written or verbal agreements between the parties." (Id.) Jim Layman's January 1, 1994, RSMA was listed as an Excluded Contract on Schedule 1.1(a).

On January 1, 1994, Ron Macy and SCBA entered into an RSMA, pursuant to which Ron Macy agreed to act as SCBA's exclusive sales representative in the states of California, Nevada, Arizona, and Hawaii. Ron Macy's RSMA contained substantially the same non-disclosure and non-compete provisions as Thoroughbred's SRA, except that Ron Macy's agreement stated that the post-termination non-compete provision would "be null and void if termination is initiated by [SCBA]." On or about July 22, 2005, Ron Macy notified SCBA of its intent to resign as SCBA's representative, indicating that it did not want its "contract carried forward to [AHI/SCAI]." (Letter of 7/22/05 from Macy to Davis, Ron Macy's Br. Opp'n Ex. C.) Ron Macy indicated its willingness to continue serving SCBA for the next thirty days and requested a termination agreement. (Id.) It appears, however, that the parties did not enter into a termination agreement. Ron Macy's January 1, 1994, RSMA was listed as an Excluded Contract on Schedule 1.1(a). Following the asset sale, Gary Owensby of AHI confirmed to Ron Macy that AHI/SCAI had not purchased Ron Macy's

4

RSMA and would not be using Ron Macy as a representative. (Macy Aff. ¶¶ 13-16, Ron Macy's Br. Opp'n Ex. B.)

Finally, on June 5, 1997, Tayler Jordan and SCBA entered into an RSMA, pursuant to which Tayler Jordan agreed to act as SCBA's exclusive sales representative in the states of New York, Maine, Massachusetts, Pennsylvania, Vermont, New Hampshire, Connecticut, New Jersey, and Rhode Island. Tayler Jordan's agreement provided:

> [Tayler Jordan] shall not represent any competitive product during the term of this agreement or any extension or renewal thereof. All trade secrets, cost information, confidential company information and marketing data acquired by [Tayler Jordan] remain the property of [SCBA] and may not be disclosed to any other person or entity for a period of three (3) years after termination of all or part of this contract. [Tayler Jordan] shall not represent any other competitor of [SCBA] for a period of three (3) years after termination of this contract.

(Tayler Jordan Regional Sales Manager Agreement at 2-3.) On June 6, 2005, Matt Davis of SCBA sent a proposed termination agreement to Richard Wejnert of Tayler Jordan. (Davis Aff. ¶ 5 & Ex. 1.) Davis states, "When I negotiated this termination agreement with Mr. Wejnert it was my understanding and agreement, on behalf of [SCBA], that the termination agreement would totally terminate and void the [RSMA] of June 5, 1997 . . . between [SCBA] and [Tayler Jordan]." (Id. ¶ 5.) On June 19, 2005, Wejnert sent an e-mail to Davis stating, "I will sign [the termination agreement] and send it back on Wednesday if you can confirm that: 1- This is the ONLY agrrement [sic] that will exist between us and any old ones are void. A simple affirmative in the form of an e-mail response will do here." (E-mail from Wejnert to Davis of 6/19/05, Davis Aff. Ex. 3.) Two days later, Davis responded, "This is confirm [sic] your notion of the new contract. The new agreement will supercede all previous agreements." (Id.) Following this exchange, Wejnert signed the termination agreement and sent it to SCBA.

5

Defendants do not dispute that, since the asset sale, they have been and are representing competitors of SCBA. AHI/SCAI requests that the Court enter a preliminary injunction to compel Defendants to comply with the non-compete provisions of their respective agreements.

## II. Motion Standard

In ruling on a motion for a preliminary injunction, a court considers four factors: "(1) whether the plaintiffs are likely to succeed on the merits; (2) whether the plaintiffs will suffer irreparable harm in the absence of an injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) whether the issuance of the injunction is in the public interest." Mich. state AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997). These are factors are to be balanced, not prerequisites that must be met. See Washington v. Reno, 35 F.3d 1093, 1099 (6th Cir. 1994). A district court need not make specific findings on each of the four factors if fewer factors are dispositive of the issue. See In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985). Thus "a finding that there is simply no likelihood of success on the merits is usually fatal." Gonzales v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000).

## III. Discussion

### A.  Likelihood of Success

AHI/SCAI contends that it is likely to prevail on the merits because Michigan law recognizes covenants not to compete so long as the restrictions on competition are reasonable as to duration and geographical scope. AHI/SCAI further contends that the restrictions in Defendants' respective agreements are reasonable. AHI/SCAI's reasonableness argument assumes too much, however, because there are two glaring holes in its premise that it has a right to enforce the non-compete provisions in the first instance. First, with regard to Thoroughbred, Jim Layman, and Tayler Jordan, their agreements with SCBA, including the non-compete provisions contained in those agreements,

6

were superseded and, thus, eliminated, by the termination agreements they signed with SCBA. Second, with regard to Thoroughbred, Jim Layman, and Ron Macy, the Purchase Agreement specifically excludes those contracts from the asset sale as Excluded Contracts. Therefore, AHI/SCAI acquired no enforceable rights under those agreements.

### 1. The Non-Compete Provisions of the Thoroughbred, Jim Layman, and Tayler Jordan Agreements Were Superseded by the Termination Agreements.

As noted above, Thoroughbred and Jim Layman both entered into letter termination agreements which provided that the termination agreements "supersede[d] all other written or verbal agreements between the parties." The Random House Dictionary of the English Language defines "supersede" as "to set aside or cause to be set aside as void, useless, or obsolete, usually in favor of something mentioned." Random House Dictionary of the English Language 1911 (2d ed. 1987). According to the plain language of the termination agreements, the parties stipulated that the original agreements were void and of no further effect. As stated in Munson v. Montie, No. 247476, 2004 WL 1393773 (Mich. Ct. App. June 22, 2004) (per curiam):

> When a subsequent agreement supersedes a prior agreement, the prior agreement is abrogated. When parties abrogate or rescind an agreement by substituting a new agreement, it is implied that there is a restoration of the status quo and a mutual discharge from any obligations under the original agreement.

Id. at *2. Therefore, by virtue of the termination agreements, Thoroughbred and Jim Layman were discharged of their obligations under their respective agreements with SCBA, including the non-compete provisions.

AHI/SCAI contends that, in spite of the language of the termination agreements, the non-compete provisions of the agreements remain in effect because the termination agreements addressed only the issue of payment of commissions and did not specifically address, and are not in conflict with, the survival of the non-compete provisions. As support for this argument, AHI/SCAI cites Nib

7

Foods, Inc. v. Mally, 70 Mich. App. 553, 246 N.W.2d 317 (1976), in which the court held that a lease was not inconsistent with a previously-executed purchase agreement. The agreement, which contained a non-competition clause covering the individual owners of the corporate sellers, covered both the sale of the restaurant business and the lease of the restaurant building and surrounding parking area. The court concluded that the later-executed lease did not supersede the prior agreement and, therefore, did not bar enforcement of the non-competition clause in the prior agreement, because the lease covered only the lease of the restaurant building and the parking area and did not address the sale of the restaurant business, which had a separate non-competition agreement. See id. at 560-61, 246 N.W.2d at 321.

Nib Foods does not help AHI/SCAI. Nothing in that court's opinion suggests that the lease agreement contained a provision such as that in the instant case stating that the "[a]greement supersedes all other written or verbal agreements between the parties." Cf. Archambo v. Lawyers Title Ins. Co., 466 Mich. 402, 414 n.16, 646 N.W.2d 170, 177 n.16 (2002) ("[W]here the later contract contains an integration clause, it cannot be said that the later contract does not supersede the earlier contract on the basis that this is not what the parties intended. Obviously, in such a situation, the integration clause provides clear evidence to the contrary, i.e., that the parties *did* intend the later contract to supersede the earlier contract. Therefore, the existence of an integration clause in the later contract necessarily indicates that the parties intended the later contract to supersede the earlier contract, and thus provides dispositive evidence with regard to which contract is controlling."). Moreover, AHI/SCAI's argument that the termination agreements only addressed the limited issue of commissions is unavailing. Nothing in the termination agreements states that they are limited in scope; to the contrary, the termination agreements are of such breadth that they cover *all* prior written or verbal agreements between the parties, without exception.

While Tayler Jordan's termination agreement did not contain a similar provision stating that it superseded all prior agreements between the parties, Tayler Jordan has provided evidence that Tayler Jordan and SCBA both intended that the termination agreement would void or supersede all previous agreements between the parties. AHI/SCAI has provided no evidence to the contrary. Instead, it relies on the Nib Foods case, but such reliance fails for the reasons stated above, namely, the evidence shows that the parties intended the termination agreement to supersede all prior agreements. AHI/SCAI also argues that Tayler Jordan "has cited no case law to this Court which supports its proposition that the parties to a contract can mutually agree that the contract is 'void' as opposed to 'terminated,'" because "[c]ontracts are generally voided by operation of law." (Pl.'s Reply Br. at 3.) At best, the argument is creative. AHI/SCAI fails to cite any case law holding that parties to a contract may not agree between themselves that a prior contract is "void" and, to this Court's knowledge, no court in Michigan, or anywhere else for that matter, has held that the use of the word "void" lies within the sole province of the judiciary.

### 2. AHI/SCAI Acquired No Rights Under the Thoroughbred, Jim Layman, and Ron Macy Agreements.

AHI/SCAI's attempts to enforce the non-compete provisions against Thoroughbred, Jim Layman, and Ron Macy fail for another, independent, reason. That is, even assuming that the Thoroughbred and Jim Layman contracts were not abrogated by the termination agreements, AHI/SCAI has no right to enforce the non-compete provisions against those Defendants or Ron Macy because it did not purchase their contracts from SCBA. As noted above, SCBA's agreements with Thoroughbred, Jim Layman, and Ron Macy were listed on Schedule 1.1(a) of the Purchase Agreement as Excluded Contracts, meaning that AHI/SCAI did not purchase them. AHI/SCAI concedes that it did not purchase these agreements. It argues, however, that it purchased the non-compete provisions of those agreements as part of the following category of Purchased Assets: "All

9

rights of [SCBA] under nondisclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of [SCBA] or with third parties relating to the Business or the Purchased Assets (or any portion thereof)." (Purchase Agreement Art. II, § 2.1(m).) AHI/SCAI contends that, because covenants not to compete survive the termination of a contract, it acquired the rights to enforce the non-competition clauses in the Thoroughbred, Jim Layman, and Ron Macy agreements under this provision of the Purchase Agreement, even though those agreements were expressly excluded from the sale.

This argument fails for at least three reasons. First, with regard to the Thoroughbred and Jim Layman agreements, as set forth above, those agreements were not merely terminated, but rather they were superseded, meaning that they are void and no longer exist. Second, as AHI/SCAI concedes, Ron Macy's agreement was not terminated and remained in effect at the time of the sale. Thus, the premise for AHI/SCAI's termination argument fails. Third, and most importantly, the argument fails because the non-competition clauses are part of written agreements that were expressly excluded from the sale, and nothing in the Purchase Agreement suggests that SCBA intended to sell even limited rights under those agreements. In fact, the Purchase Agreement makes clear that this is not the case because, with respect to Excluded Assets, it states: "Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain *all right, title, and interest to, in, and under the Excluded Assets*." (Purchase Agreement Art. II, § 2.2. (italics added).) AHI/SCAI incorrectly argues that Article II, Section 2.1(m) and Article II, Section 2.2 are ambiguous when read together. Article II, Section 2.2 states, in no uncertain terms, that SCBA retained all rights in the Excluded Assets, while Article II, Section 2.1(m) merely recognizes that AHI/SCAI purchased all of SCBA's rights under non-disclosure and confidentiality agreements not specifically excluded from the purchase. Consequently, in order to accept

10

AHI/SCAI's argument, the Court would be required to ignore the well-worn rule of contract interpretation that a court must, in construing a contract, give "harmonious effect, if possible, to each word and phrase," Singer v. Goff, 334 Mich. 163, 168, 54 N.W.2d 290, 292 (1952), because such a construction would require the Court to disregard SCBA's reservation of all rights under Article II, Section 2.2.

**B.     Irreparable Harm**

The Fifth Circuit has noted:

> Federal courts have long recognized that, when "the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction." In short, "[t]he key word . . . is *irreparable,*" and an "injury is 'irreparable' only if it cannot be undone through monetary remedies." Thus, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[]s heavily against a claim of irreparable harm." The absence of an available remedy by which the movant can later recover monetary damages, however, may also be sufficient to show irreparable injury.

Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472-73 (5th Cir. 1985) (footnotes and citations omitted). See also Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992) (stating that "a plaintiff's harm is not irreparable if it is fully compensable by money damages.").

AHI/SCAI contends that it will suffer irreparable harm because it paid $45 million to acquire the assets of SCBA and much of the purchase price was for the goodwill of the business. It argues that an injunction is the only way to protect the goodwill because it will inevitably lose business, and therefore, part of its goodwill, if Defendants are allowed to represent direct competitors. AHI/SCAI notes that because Defendants, as former SCBA sales representatives, have primary contact with the dealers and distributors that actually sell the products, Defendants are in a position to influence the dealers and distributors, who are actually "customers" of AHI/SCAI. AHI/SCAI contends that there

will be no way to determine its loss, with any certainty, because it will be impossible to calculate the value of future sales that it would have received through referrals to new customers from existing customers, which may be lost if Defendants are allowed to compete.

The Court concludes that this factor weighs against granting the requested relief, especially given that there is little likelihood of success in this case. In particular, AHI/SCAI admits that it has not lost any business as of this time, even though Defendants have been competing for several months, and it has not offered anything beyond mere speculation to show that it will lose any business if Defendants are allowed to continue working for the competitors. Moreover, as the Court indicated at oral argument, it finds no reason to conclude that, in the event AHI/SCAI is able to establish liability, AHI/SCAI cannot establish damages with reasonable certainty. Finally, AHI/SCAI has not shown that Defendants have access to any trade secrets or confidential information, including pricing information, that was not known to the public and which Defendants may use to unfairly compete with AHI/SCAI.

**C.    Substantial Harm to Others**

AHI/SCAI concedes that granting an injunction may harm Defendants because they will not be able to represent their current body armor suppliers for a finite period. In light of AHI/SCAI's low likelihood of success on its claims and the absence of evidence that Defendants are using confidential information, the Court concludes that the requested injunction will cause substantial harm to Defendants and that such harm will outweigh any harm to AHI/SCAI. Moreover, the loss to AHI/SCAI is only a possibility, whereas the loss to Defendants, and the companies that they represent, will be a certainty.

**D.      Public Policy Considerations**

AHI/SCAI argues that the public interest will be protected by granting the injunction because Michigan law supports the enforceability of contracts and Michigan recognizes non-competition agreements as valid. On the other hand, Tayler Jordan and Ron Macy argue that public policy interests favor denying the injunction because the real issue is the preservation of free competition. As this Court noted at oral argument, these two considerations are always in play when a court is requested to enforce an agreement restricting competition. In light of the low likelihood of success in this case, as well as AHI/SCAI's failure to offer any reason other than pure restraint of competition for enforcing the non-competition provisions, the Court concludes that the public's interest in free competition is paramount. Therefore, this factor weighs against granting the requested relief.

## IV.  Conclusion

Based upon the foregoing, the Court concludes that the balance of factors, especially the low likelihood of success on the merits, weighs heavily against granting the requested injunctive relief. The Court will therefore deny the motion.

An Order consistent with this Opinion will be entered.


Dated:  April 12, 2006                                            /s/ Gordon J. Quist
                                                                            GORDON J. QUIST
                                                              UNITED STATES DISTRICT JUDGE